J. C. OSBORNE V. THE STATE.

No. 21456. Delivered April 23, 1941.
Rehearing Denied June 11, 1941.

The opinion states the case.

*Myres & Myres,* of Fort Worth, for appellant.

*Lloyd W. Davidson,* State's Attorney of Austin, for the State, on submission.

GRAVES, Judge.

The offense is maiming; the punishment, confinement in the penitentiary for two years.

On the night of the 31st of October, 1939, appellant, Buster Phillips, and others were in the store of Bud Hudson in the town of Eulogy. Phillips and one Thompson had a quarrel and were ordered out of the house by Mrs. Hudson. It appears that appellant, who was present, was also told to leave. It is not shown that appellant was a participant with Phillips in his difficulty with Thompson. After this quarrel and while appellant and Phillips were standing in the hallway of the store near W. P. McMichael, the injured party who was the son-in-law of Mr. Hudson, Bertha Hudson approached and asked McMichael if he would take her and other parties to their homes. He replied in the affirmative, saying that he would be ready in about fifteen minutes. This conversation took place in the presence of Phillips and appellant. Immediately thereafter they went outside, mounted a horse and rode away in the direction of the Hill Creek bridge, which was about eighth-tenths of a mile west of Bud Hudson's place. Ten or

fifteen minuter after they left W. P. McMichael and his wife drove away from the store in the automobile of Bud Hudson for the purpose of taking Bertha Hudson and other parties home. Before reaching their destination they crossed Hill Creek bridge. They traveled the same road to the bridge appellant and Phillips used, but did not see them until they had carried their passengers home and were making the return trip to Hudson's. On crossing the bridge the first time they noticed nothing unusual. There were no rocks piled on the bridge. After crossing the bridge the first time Mr. McMichael drove the car about half a mile to a point near the home of Mrs. Briscoe, where he discharged his passengers. He remained there a minute or two before beginning the return trip. As he and his wife proceeded toward Hill Creek bridge he was driving about twenty miles an hour. Touching the condition of the bridge, we quote from the testimony of Mr. McMichael as follows:

"This Hill Creek bridge is about thirty yards long and has big high bannisters on it, and it has a rock wall that runs about four feet from the bridge on the right and left hand sides before you enter on to the bridge, just four or five feet. As to the rock wall, I mean at the west end of the bridge there is a rock wall that extends on further west from the bridge. I don't think this bridge has the same kind of a rock wall at the east end. As to the height of the bridge from the bed of the creek, I would say at the deepest part it is fifteen feet high from the bed of the creek."

Relative to the attack made upon him when he reached the bridge on his return trip to Mr. Hudson's, the witness said:

"As I was coming along that road I was coming east, and something happened there that attracted my attention. I saw that there was some rocks piled on top of the bridge as I approached the bridge. The rocks I saw piled on the bridge was just two or three feet from the very extreme west end of the plank portion of the bridge. The rocks were back east from the west end of the bridge. As to the number of rocks piled on the bridge, there were five or six big rocks stacked on top of each other. That is not a two-way or two-car bridge. It is a one-way bridge. It was not possible for me to go across this bridge with my car without running my car into these rocks. The rocks were of sufficient size that they probably would have hit up under my car, and the axels, etc. I was about twenty yards

from these rocks when I first saw them, and when I did see them I slowed down my car. When I slowed down my car there was something else that attracted my attention about that time. I saw J. C. Osborne, the defendant, and Buster Phillips standing out to the left of the bridge. * * * They were both there, and I could see them plainly. After I saw them, a rock was thrown through the windshield of my car. The rock came through the windshield on the left hand side. That is the side where I was sitting. Buster Phillips threw that particular rock that came through the windshield there. I saw J. C. Osborne there at that time. J. C. Osborne was just a step or two behind Buster Phillips. As to what J. C. Osborne was doing at the time Buster Phillips threw the rock, just as Buster Phillips threw the rock J. C. Osborne raised up from behind him. * * * I did not hear any conversations out there between Buster Phillips and J. C. Osborne. I did not hear either one of them speak a word to the other."

As Phillips threw the rock, and apparently before appellant stood up, Mr. McMichael shoved his wife down in the car to prevent her being struck. She testified that she saw Phillips, but not appellant, at the scene of the assault. Mr. McMichael's eye was injured to the extent that he lost his sight not long after the assault. After being hit he drove his car across the bridge and proceeded to Mr. Hudson's. The following morning Mr. Hudson inspected his car and discovered a dent just above the windshield, which he described as follows: "It was a place that looked like it had been hit and dented in. The place was about as big as a dollar or bigger. It was just above the windshield on the edge of the top of the car. There were scratches or sliding marks on the place that made it appear to me as if something had hit it and slid off. This was my car, and before the night that this rock throwing took place I hadn't noticed this dent in place there on the automobile." The windshield of the car was broken. In the course of his testimony Mr. McMichael said:

"You now show me a shattered and broken windshield. That is the windshield that was in the pick-up truck on the night of October 31st, 1939. You also show me two pieces of rock. It is a large piece of rock and small piece of rock. I have seen those pieces of rock before. That is the rock that was thrown through the windshield of the car in which I was riding that night. That big piece of rock was found in the car right up over the back glass in that little curtain inside the

cab. The smaller portion of the rock was found on the floorboard of the car. You ask me to place the smaller portion of rock to the larger portion of rock. I have done that. The smaller portion of rock fits on to this larger rock. These two pieces of rock are the same two pieces of rock we found in the car."

Clark Royal, a deputy sheriff, testified that he went to the Hill Creek bridge early in the morning after the assault and found a number of rocks piled on the bridge in such manner as to barely leave room enough for cars to pass over the bridge. We quote from his testimony, as follows:

"When I drove up on the bridge there were a bunch of rocks piled on the bridge, with just room enough for cars to go through. I got out and looked around and threw the rocks off the bridge so the cars could pass. I then looked around and found where a horse had been tied on the north side of the road by the side of the abutment that comes up on the bridge proper. The horse had been standing there by a little elm bush. There were two sets of foot tracks around there, but I couldn't track them away from there. I then picked up the horse's tracks and tracked it back to the Bud Hudson place, and there I found where the horse had been tied to a fence. I then went back to the bridge and tracked the horse west to the Osborne place. I tracked the horse to J. C. Osborne's house. I am talking about this defendant, J. C. Osborne. I would say that the place where J. C. Osborne lived at that time was about two and three-quarters or three miles from Bud Hudson's place. * * * I would say that the floor of the main portion of the Hill Creek bridge is about forty feet long, but there are approaches that come up on each side. * * * In coming west from Bud Hudson's house when you get to the bridge you can come around the abutment down the side there and get down in under the bridge. I went down around by the abutment and in under the bridge. There were horse tracks that led from up on the road and down by the abutment on down by the side of the bridge. I would say it is about sixteen or eighteen feet from the bottom of this Hill Creek up to the top of the main bridge. There was plenty of room for a person or a horse or anybody else to go down in under there. I stated that I found some foot tracks down by the side of this bridge. The tracks went up the abutment from the bottom on the north side, on the right hand side of the bridge as you go west. They came up the abutment to the top of the bridge. The tracks showed that somebody made several trips going up and down. * * * There were

two sets of human foot tracks or prints there. One set of the tracks was made with a sharp-toed shoe, about an eight in size, and the other set of tracks was made by a shoe that looked like a work shoe, or kind of a wide-toed shoe. Those shoe tracks were there together, and were mixed up. You could see they had been going up and down there, and walking around there. They were all mixed up. * * * The tracks I saw came up the embankment there to the rock wall about middle ways from the bridge to the end of the approach or rock wall. At that point where the tracks came up the embankment to the approach, the rock retaining wall was about six feet high. Some of these rock I found on top of the bridge there had been taken out of this retaining wall. The prints were there to show where they had been pulled up or off of the retaining wall."

Touching the description of the horse tracks found near the bridge, the witness said: "The front tracks were round, or almost round, and the back tracks were kind of pointed. They were not made by a shod horse. I then traced the horse track from there to Bud Hudson's place and out to the fence where a horse had been apparently tied, or had been standing."

The testimony was to the effect that the horse ridden by the appellant and Phillips from the Hudson place on the night of the assault had been tied to the garden fence about ten or fifteen steps from the Hudson house.

The deputy sheriff testified further, as follows:

"As to the number of rocks that were on the bridge at the time I got there, I threw off seven rocks. As to the number of tracks that came up the embankment there towards the road, I couldn't tell how many times they had been up and down the embankment. It looked to me like more than one trip had been made up and down there. It looked like more than one trip had been made up and down the embankment there by both the pointed shoe and the broad-toed shoe. I didn't count them and I couldn't tell how many trips they made. I could just tell there were several trips made up and down there."

Another witness who had been to the bridge on the night of the assault, which was prior to the time the deputy sheriff visited the bridge, said: "I noticed the bridge was blocked with a bunch of big rocks piled on the front of the bridge, and I got out of my car and rolled enough of them out of the way that I could get by and over them."

When the officer found appellant and Buster Phillips he

observed their shoes. He testified: "The defendant, J. C. Osborne, at the time was wearing on his feet low-quartered sharp-toed slippers. The track which the slipper made that the defendant had on at the time I found him was kind of a sharp-toed track, round on the outside and then came up sharp. The track I saw under the bridge there came out round and sharp, like I have described this track. I also saw Buster Phillips on that same day. * * * He was wearing work shoes, kind of a heavy shoe. That shoe he had on made kind of a broad track. It wasn't a sharp-toed track, but it was a little bit wide and the track had a scar where a part of the sole was gone from the shoe. The track I saw there at the Hill Creek bridge showed to be made by the same kind of a shoe, by the print left there in the sand. I found the print of that place there in the sand by the Hill Creek bridge. That was on the right shoe, and down there by the bridge the track that showed that place in the sole of the shoe was made by a right shoe."

Appellant failed to testify and introduced no witnesses.

In his charge the court defined principals as follows:

"All persons are principals who are guilty of acting together in the commission of the offense.

"Any person who advises or agrees to the commission of an offense and who is present when the same is committed is a principal whether he aid or not in the illegal act."

In applying the law to the facts the jury were instructed in a single paragraph in the charge to convict appellant if they believed from the evidence beyond a reasonable doubt that he "was acting with Buster Phillips and did then and there unlawfully, willfully, and maliciously deprive W. P. McMichael of a member of his body, to-wit, his right eye by then and there willfully and maliciously putting out his said eye with a rock," etc., or to convict him if they believed beyond a reasonable doubt that Phillips "unlawfully, willfully and maliciously deprived W. P. McMichael of a member of his body, to-wit, his right eye by then and there willfully and maliciously putting out his said eye with a rock," etc., and that appellant advised or agreed to the commission of the offense, if any, and was present when said offense, if any, was committed by Phillips. Appellant objected separately to each phase of the charge on the ground in the first instance that there was no evidence showing that he acted with Phillips at the time the rock was thrown which destroyed the eyesight of the injured party, and in the

second instance on the ground that there was no evidence that appellant advised or agreed to the commission of the offense. In connection with his exceptions appellant requested the court to submit to the jury the law of principals as defined in Article 66, P. C., in the event any charge on the subject was given. The article in question reads:

"When an offense is actually committed by one or more persons, but others are present, and knowing the unlawful intent, aid by acts or encourage by words or gestures, those actually engaged in the commission of the unlawful act, or who, not being actually present, keep watch so as to prevent the interruption of those engaged in committing the offense, such persons so aiding, encouraging or keeping watch are principal offenders."

It will be noted that in the portion of the court's charge above quoted,—the first paragraph is Art. 65, P. C., and the second paragraph is Art. 69, P. C.,—both in their entirety are as set forth in the statute. The requested instruction, Art. 66 P. C., seems to us not be necessarily called for by the facts shown herein as applied to the law, in view of the two previous articles of the statute that were embodied in the charge, Arts. 65 and 69, P. C. The latter portion of Art. 66 P. C., could not be used, there being positive proof, with no denial, of appellant's actual bodily presence at the scene of the rock throwing.

The trial court, when applying the law to the facts, gave the two following comprehensive paragraphs in his charge to the jury:

"Now if you should find and believe from the evidence beyond a reasonable doubt that on or about the 31st day of October, A. D. 1939, in Bosque County, Texas, the defendant, J. C. Osborne, was acting with Buster Phillips and did then and there unlawfully, willfully, and maliciously deprive W. P. McMichael of a member of his body, to-wit, his right eye, by then and there wilfully and maliciously putting out his said eye with a rock, and the said J. C. Osborne did then and there thereby maim the said W. P. McMichael, or if you find and believe from the evidence beyond a reasonable doubt that Buster Phillips on or about the 31st day of October, A. D. 1939, in Bosque County, Texas, did then and there unlawfully, wilfully and maliciously deprive W. P. McMichael of a member of his body, to-wit, his right eye, by then and there wilfully and maliciously putting out his said eye with a rock, and the said Buster Phillips did

then and there thereby maim the said W. P. McMichael, and if you further find and believe from the evidence beyond a reasonable doubt that the defendant, J. C. Osborne, advised or agreed to the commission of said offense, if any, and was present when said offense, if any, was committed by the said Buster Phillips, whether he, the said J. C. Osborne, aided or not in the illegal act, then you will find the defendant guilty of maiming, as charged in the second count of the indictment, and assess his punishment at confinement in the state penitentiary for any term of years not less than two nor more than ten.

"You are further instructed that you cannot convict the defendant, J. C. Osborne, by reason of his mere presence, if he was, at the place where the offense is alleged to have occurred, but before you can convict the defendant you must either find and believe from the evidence beyond a reasonable doubt that Buster Phillips committed the offense charged in the indictment and that J. C. Osborne was present and acted together with the said Buster Phillips in the commission of said offense, if any, or that the said Buster Phillips committed the offense charged in the indictment and that the said J. C. Osborne had advised or agreed to the commission of the offense and was present when same was committed, whether he aided or not in the illegal act, and unless you do so find and believe from the evidence beyond a reasonable doubt that the said Buster Phillips committed the offense charged in the indictment and that the said J. C. Osborne was present and acted with him in the commission of said offense, if any, or that the said Buster Phillips committed the offense charged in the indictment and that the said J. C. Osborne was present and advised or agreed to the commission of said offense, if any, you will find the defendant not guilty."

We think the circumstances are ample to say from the State's proof that on the night in question appellant and Buster Phillips were at an entertainment in the town of Eulogy, in Bosque County, together; that after the entertainment they were again together at Mr. Hudson's home at a dance; that Phillips got into some sort of an argument with Leland Thompson; that Mrs. Hudson ordered both of them out of the house, appellant again with Phillips; that appellant and Phillips heard Mr. McMichael tell Bertha Hudson that he would take her home in about fifteen minutes, she living beyond the Hill Creek bridge. She says: "I saw them standing there and listening. These

two boys, J. C. Osborne and Buster Phillips, then went on the outside." These two boys were then seen to leave on a horse together bareback in the direction of the Hill Creek bridge, Osborne in front on the horse. The deputy sheriff on the next morning back-tracked a horse to where he was tied at Mr. Hudson's house, the tracking having been begun at Hill Creek bridge in the ditch alongside thereof. On this bridge were found seven or more rocks piled on this one way bridge, with numerous shoe tracks identified circumstantially as those of appellant and Phillips, showing where more than one trip was made to an abutment of rocks to said bridge from which these rocks were taken. Then the officers tracked the horse to the Jap Phillips' pasture, and from there to the Osborne place, where appellant lived, and testified that this horse with its peculiar feet was Charlie Osborne's horse, and that appellant lived there. These circumstances, taken in connection with the positive testimony of Mr. McMichael, were sufficient to allow the jury to conclude that appellant agreed to the commission of this offense and acted together with Phillips, not only in carrying him to the scene but in planting the barricade, all the time being present with Phillips.

We think the trial court went as far in his statement of the law of principals as was justified, and correctly applied the same to the facts shown herein, and finding no error in the record the judgment is affirmed.

### ON APPELLANT'S MOTION FOR REHEARING.

BEAUCHAMP, Judge.

Appellant has filed a very pointed and concise motion for rehearing in this cause and his counsel has also made an able oral argument in his behalf. We think the facts as set out in the original opinion would justify the subission of the case to the jury and support the verdict which they returned. The evidence shows that appellant and Phillips were principals and were acting together both before and at the very time of the commission of the offense. At least, there is evidence sufficient upon which the jury might have so found, but this is not the question for our consideration at this time.

Complaint is made that the last part of section five of the court's charge applying the law to the facts of the case shifts the burden of proof, and that the appellant is not given the benefit of reasonable doubt. Section 5 of the court's charge reads as follows:

"You are further instructed that you cannot convict the defendant, J. C. Osborne, by reason of his mere presence, if he was, at the place where the offense is alleged to have occurred, but before you can convict the defendant you must either find and believe from the evidence beyond a reasonable doubt that Buster Phillips committed the offense charged in the indictment and that J. C. Osborne was present and acted together with the said Buster Phillips in the commission of said offense, if any, or that the said Buster Phillips committed the offense charged in the indictment and that the said J. C. Osborne had advised or agreed to the commission of the offense and was present when same was committed, whether he aided or not in the illegal act, and unless you do so find and believe from the evidence beyond a reasonable doubt that the said Buster Phillips committed the offense charged in the indictment and that the said J. C. Osborne was present and acted with him in the commission of said offense, if any, or that the said Buster Phillips committed the offense charged in the indictment and that the said J. C. Osborne was present and advised or agreed to the commission of said offense, if any, you will find the defendant not guilty."

Contention is made that Hathcock v. State, 263 S. W. 587, sustains the position on this point which appellant again raises on his motion. This was before us on the original hearing and, while the authority cited is in accordance with decisions of this court in many cases, we cannot see that it applies to the instant case. In the Hathcock case the court did not submit the law of reasonable doubt at all, but instructed the jury what they must find as a fact. In the charge above copied everything is based upon the jury's finding "from the evidence beyond a reasonable doubt." In the very section-complained of we find this language and each succeeding phrase connected by "and" and "or" is based upon such finding. This is a matter of grammatical construction which we do not believe could possibly confuse the jury, particularly in view of the many times in the first part of section five, and throughout the charge, that the court has so instructed them. There is no sentence taken alone from which we may find an instruction to the jury where we do not also find the instruction that they must conclude from the evidence "beyond a reasonable doubt."

We are frank to admit that the case is one with its difficulties. It was before the court for consideration for several weeks and each member of the court has conferred on the

several points treated in the original opinion with rather unusual care, resulting in the conclusions expressed in the original opinion. We have again given consideration to those questions emphasized on the motion for rehearing, and believe that the original opinion correctly and sufficiently discusses the propositions presented on the appeal and, so concluding, the motion for rehearing is overruled.